**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

PAYTON HERRES
Plaintiff,

v.

COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD
Defendant.

Case No.

Judge

**COMPLAINT FOR RECOVERY OF PLAN BENEFITS, CLARIFICATION OF RIGHTS TO FUTURE BENEFITS, AND EQUITABLE RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(1)(B) AND (a)(3)**

Plaintiff Payton Herres ("Plaintiff" or "Ms. Herres"), by counsel, for her Complaint against Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem"), states as follows:

## INTRODUCTION

1. Ms. Herres is a heart transplant recipient. She received her donor heart at Cincinnati Children's Hospital Medical Center in March 2012, when she was eleven years old. More than fourteen years later, that heart is healthy because she takes a daily anti-rejection medication, Everolimus 0.5 mg ("Everolimus," brand name "Zortress"), that her transplant team chose for her after she could not tolerate the standard regimen. Her physicians have made clear that an interruption of even a single day of this medication could cause rejection of her heart and death.

2. This action does not ask whether Anthem must cover Everolimus. After first denying coverage outright, and forcing Ms. Herres to appeal the denial aggressively, Anthem reversed itself and finally approved the drug. This action, however, concerns what Anthem may

charge Ms. Herres for the drug once it was forced to cover. Ohio law, and the express terms of Ms. Herres's Anthem health plan, forbid Anthem from requiring a cost-share greater than what Ms. Herres would pay for the drug if she bought it without insurance at all.

3. Anthem has done exactly what its own Plan prohibits. It has required Ms. Herres to pay $1,204.38 for a 90-day supply of Everolimus that she can buy, without using her insurance, for $280 to $288. That is more than four times the cash price. Anthem has charged $404.38 and $500.00 for a 30-day supply, far more than the price of a full 90-day supply without insurance.

4. When Ms. Herres raised this in a written appeal, quoted the Plan provision, and asked Anthem to identify the pricing it used and explain how its cost-share complied with the Plan, Anthem answered a question she did not ask. In a letter of about a page and a half, sent five days later, Anthem said Everolimus was "not eligible for a tiering exception." It did not address the Plan provision or Ohio law, did not disclose a single price, and did not produce any of the documents Ms. Herres requested. In sum, Anthem's response was deficient and fell short of the "full and fair review" guarantees of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which governs the health benefit plan that provides Ms. Herres coverage for her life-saving treatments.

5. Ms. Herres brings this action under ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3), to recover the benefits due to her, to enforce her rights under the terms of the Plan, to clarify her right to future benefits, and to obtain an injunction requiring Anthem to cap her cost-share at the amount the Plan and Ohio law allow.

## PARTIES

6. Ms. Herres is an adult who resides in Montgomery County, Ohio.

7. At all relevant times, Ms. Herres has been a participant in the Donald P. Herres Co. LLC group health plan (the "Plan"), as the term is defined in 29 U.S.C. § 1002(7). Ms. Herres obtains coverage as an employee of Dollar Towne.

8. The Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1), established and maintained by Dollar Towne (the "Plan Sponsor") to provide medical and prescription drug benefits to its employees and their dependents. The Plan's benefits are fully insured by Anthem. The terms of that policy and Anthem's Summary Plan Description ("SPD") set out the benefits the Plan provides. As a "fully insured" health benefit plan, this policy is governed both by ERISA and applicable Ohio State insurance laws and regulations.

9. Defendant Community Insurance Company is an Ohio corporation licensed by the Ohio Department of Insurance ("ODI") to transact the business of insurance in Ohio. Its statutory home office and main administrative office are located at 4361 Irwin Simpson Road, Mason, Ohio 45040. It does business in Ohio as Anthem Blue Cross and Blue Shield and is a subsidiary of Elevance Health, Inc.

10. Anthem is a "health plan issuer" within the meaning of Ohio Rev. Code § 3922.01. Because the Plan is fully insured, Anthem pays Plan benefits from its own assets and has final authority to decide claims and appeals for benefits under the Plan. Anthem therefore exercises discretionary authority and control over the administration of the Plan and the disposition of Plan assets and is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A). Anthem is the party obligated to pay the benefits at issue and is a proper defendant under 29 U.S.C. § 1132(a)(1)(B).

11. Anthem administers the Plan's pharmacy benefits itself or through its affiliate CarelonRx, Inc. ("CarelonRx"), a pharmacy benefit manager owned by Elevance Health, Inc., acting as Anthem's agent.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) and (f), because this action arises under ERISA.

13. Venue is proper in this District under 29 U.S.C. § 1132(e)(2) because Anthem resides and may be found in this District, the Plan is administered in this District, and the conduct alleged here took place in this District. Venue is also proper under 28 U.S.C. § 1391(b).

14. Assignment to the Western Division at Cincinnati is proper under S.D. Ohio Civ. R. 82.1 because Anthem resides in Warren County, Ohio.

## FACTUAL ALLEGATIONS

### A. Ms. Herres's Heart Condition, Transplant, and Everolimus Prescription.

15. Ms. Herres was born with Ebstein anomaly, a rare congenital heart defect in which the tricuspid valve, the valve between the right atrium and the right ventricle, is malformed and displaced downward into the right ventricle. Because the malformed valve does not close properly, blood leaks backward from the right ventricle into the right atrium with each heartbeat, a condition called tricuspid regurgitation. In Ms. Herres's case the regurgitation was severe.

16. Over the course of her childhood, Ms. Herres's heart progressively failed. In December 2011, when she was eleven years old, Ms. Herres was diagnosed with end-stage heart failure.

17. In February 2012, Ms. Herres was diagnosed with congestive heart failure. She developed a blood clot in the right atrium of her heart on March 2, 2012. Ms. Herres sought care

in Michigan to get the clot dissolved, where she was informed that her heart was damaged beyond repair by means of a tricuspid valve replacement. She was transferred by Mobile Intensive Care Unit to Cincinnati Children's Hospital Medical Center and placed on the national heart transplant waiting list at Status 1A, the highest level of medical urgency.

18. Just over two weeks after her diagnosis, on March 18, 2012, Ms. Herres received a donor heart transplant at Cincinnati Children's Hospital Medical Center.

19. A heart transplant recipient must take immunosuppressive ("anti-rejection") medication every day for the rest of their life. Without it, the recipient's immune system recognizes the donor heart as foreign and attacks it. Missed or interrupted doses can trigger acute rejection, which can destroy the transplanted heart and cause death.

20. After her transplant, Ms. Herres was placed on a standard immunosuppressive regimen that included cyclosporine (Neoral), a calcineurin inhibitor. Ms. Herres attempted several antirejection medications, including Mycophenolate Mofetil (Cellcept), Tacrolimus (Prograf), Mycophenolic Acid (Myfortic), and Prednisone, but still experienced organ rejection on each medication.

21. Ms. Herres's transplant team therefore transitioned her to Everolimus 0.5 mg, in conjunction with cyclosporine. Everolimus is an immunosuppressant of the class known as mammalian target of rapamycin inhibitors. It is marketed under the brand name Zortress and is also available as a generic drug.

22. Ms. Herres's transplant team selected Everolimus specifically to stabilize her graft, prevent cardiac allograft vasculopathy ("CAV"), and support post-transplant kidney function. CAV is an accelerated, diffuse narrowing of the coronary arteries of a transplanted heart, caused largely by the recipient's immune system injuring the lining of the donor heart's blood vessels.

Unlike ordinary coronary artery disease, CAV tends to thicken the vessel walls along their entire length rather than in isolated plaques. CAV is the leading cause of late graft failure and death after heart transplantation.

23. Transplant cardiologists grade CAV using the standardized nomenclature adopted by the International Society for Heart and Lung Transplantation ("ISHLT"). The ISHLT scale has four grades, based on the degree of narrowing seen on coronary angiography and on whether the transplanted heart is still pumping normally, ranging from CAV0 (best, no detectable narrowing of any coronary artery) to CAV3 (severe narrowing detected).

24. Everolimus inhibits the proliferation of the smooth muscle cells in the blood vessel wall that drives the thickening characteristic of CAV.

**B. Everolimus Has Protected Ms. Herres's Heart for More Than a Decade.**

25. Everolimus has worked exceptionally well for Ms. Herres. For approximately thirteen-and-a-half years, Ms. Herres has taken Everolimus every day, and her transplanted heart has remained stable without a significant rejection episode.

26. Ms. Herres's most recent coronary evaluation, performed at the Cleveland Clinic on May 26, 2026, was graded CAV0: no detectable vasculopathy, more than fourteen years after her transplant.

27. Ms. Herres's treating transplant physicians have determined that Everolimus is medically necessary for her and that an interruption of even one day of her Everolimus regimen could cause rejection of her transplanted heart and death.

**C. Anthem Denies Coverage of Everolimus, Then Reverses Itself.**

28. In a written decision dated February 26, 2025, Anthem denied coverage of Ms. Herres's Everolimus in its entirety. Anthem stated that it did not see support for Everolimus in

heart transplant patients and that its criteria generally contemplate use of the medication for certain liver and kidney transplant patients.

29. Ms. Herres appealed the denial. In September 2025, Anthem upheld its denial.

30. Following both Ms. Herres's appeal of this September 2025 denial, her transplant team conducting a peer-to-peer review, and Ms. Herres's viral social media campaign to bring public awareness to the life-threatening situation she was placed in, Anthem publicly stated that its denial failed to take into account Ms. Herres's treatment history and reversed its denial, approving coverage of Everolimus for the period September 9, 2025, through September 9, 2026. On information and belief, Anthem reversed course because it recognized that interrupting Ms. Herres's Everolimus could be life-threatening and could cause rejection of her transplanted heart. As alleged below, ODI later reported that Anthem gave exactly that reason.

### D. Anthem Requires Ms. Herres to Pay More for Everolimus with Insurance Than Without It.

31. Anthem has placed Everolimus on the fourth tier of its drug list, and under its tiering criteria quoted Ms. Herres the following cost-sharing amounts for Everolimus 0.5 mg:

(a) For a claim processed on March 22, 2026, for a 30-day supply: approximately $404.38;

(b) For a claim processed on March 22, 2026, for a 90-day supply: approximately $1,204.38; and

(c) For a claim processed on May 11, 2026, for a 30-day supply: approximately $500.00.

32. Ms. Herres researched alternatives and located discount pricing for her medication. In May 2026, using a GoodRx coupon and without using her Anthem coverage, Ms. Herres could obtain a 90-day supply of Everolimus 0.5 mg at CVS Pharmacy or at CVS Pharmacy inside Target for between $280 and $288.

33. Anthem's cost-share for a 90-day supply, $1,204.38, is more than four times the $288 non-insured price for the same supply, an overcharge of at least $916.38 per 90-day fill. Anthem's cost-share for a single 30-day supply, $404.38 or $500.00, exceeds the non-insured price of an entire 90-day supply.

**E. The Plan and Ohio Law Cap Ms. Herres's Cost-Share at the Price She Would Pay Without Insurance.**

34. The SPD contains a provision titled "Important Note on Prohibited Pharmacy Benefit Practices," which provides: "A health insurance plan cannot require a cost-share that is greater than the amount you would pay for a prescription drug if the drug were purchased without coverage under the health benefit plan."

35. That provision reflects Ohio law. At all relevant times through June 29, 2026, Ohio Rev. Code § 3959.20(B) provided, and since June 30, 2026, Ohio Rev. Code § 3957.26(B) (as renumbered by H.B. 229, 136th Gen. Assemb.) has provided, that:

> No health plan issuer, pharmacy benefit manager, or any other administrator shall require cost-sharing in an amount, or direct a pharmacy to collect cost-sharing in an amount, greater than the lesser of either of the following from an individual purchasing a prescription drug: (1) The amount an individual would pay for the drug if the drug were to be purchased without coverage under a health benefit plan; (2) The net reimbursement paid to the pharmacy for the prescription drug by the health plan issuer, pharmacy benefit manager, or administrator.

36. The statute defines "cost-sharing" as "the cost to an individual insured under a health benefit plan according to any coverage limit, copayment, coinsurance, deductible, or other out-of-pocket expense requirements imposed by the plan." Ohio Rev. Code § 3959.20(A)(1); *id.* § 3957.26(A)(2).

37. Because the Plan is fully insured, these provisions of Ohio law regulate insurance and are saved from ERISA preemption. 29 U.S.C. § 1144(b)(2)(A). A state law that regulates

insurance becomes part of the terms of the insured plan and is enforceable in an action, and additionally the Plan expressly incorporates the cost-sharing limitation into its own terms.

38. Under the terms of the Plan, therefore, Ms. Herres is entitled to obtain Everolimus for a cost-share no greater than the amount she would pay for the drug without coverage.

**F. Ms. Herres's Complaint to the Ohio Department of Insurance.**

39. On or around December 19, 2025, Ms. Herres submitted a complaint about Anthem to ODI. On or around January 1, 2026, Ms. Herres also contacted her State Senator about Anthem's handling of her medication.

40. On or around March 20, 2026, ODI responded to Ms. Herres. ODI's response summarized Anthem's explanation to ODI. According to ODI, Anthem stated that its guidelines generally do not approve Everolimus for heart transplant patients (despite having previously approved the drug for Ms. Herres, a heart transplant patient, for over a decade), and Anthem acknowledged that it had overturned its denial because stopping the medication could be life-threatening and could cause rejection of Ms. Herres's transplanted heart. ODI's response also provided pricing resources indicating that Everolimus was available for $350 for a 30-day retail supply and for $350 for a 90-day supply through CarelonRx, Anthem's affiliated mail-order pharmacy, and that Anthem understood Ms. Herres planned to use GoodRx to buy Everolimus at a reduced price. Since ODI's communication, Anthem has raised the Tier 4 Prescription Drug cost share to a co-pay of $400 for both options under Ms. Herres's plan.

41. Moreover, the $400 copay for a 90-day supply applies only to orders through CarelonRx, and Anthem charges the same $400 copay for a mere 30-day supply at brick-and-mortar pharmacy locations (triple the cost per dose). Ms. Herres has expressed to Anthem via written correspondence that, because an interruption in her Everolimus therapy of even a single

day could be fatal, receipt of the drug by mail through CarelonRx is insufficient. On one occasion, one CarelonRx Everolimus shipment was delivered to a Dollar Tree instead to Ms. Herres's delivery address, where Dollar Tree employees accepted the package and threw its contents into a dumpster. To date, Anthem has dismissed Ms. Herres's concerns about the inherent and potentially fatal risk of CarelonRx's inconsistent deliveries and not provided Ms. Herres an alternative option to receive a 90-day supply with the single $400 copay. Indeed, the "designated point of contact" Anthem provided Ms. Herres when she brought this mis-delivery to the Defendant's attention, has not called or emailed Ms. Herres despite Ms. Herres making multiple attempts to reach her.

42. ODI, for its part, did not resolve Ms. Herres's complaint or intervene on her behalf. Upon information and belief, ODI did not independently and critically investigate the actual co-pay cost of Everolimus for Ms. Herres. But its response confirms that Anthem knows that interrupting Ms. Herres's Everolimus could kill her, and that Everolimus was available to Ms. Herres at prices well below the cost-share Anthem required.

43. Two days after ODI's letter, on March 22, 2026, Anthem processed a 90-day claim requiring Ms. Herres to pay $1,204.38, more three times as much as the cost share provided to ODI.

**G. Ms. Herres's Internal Appeal and Anthem's Nonresponsive Denial.**

44. On June 26, 2026, Ms. Herres timely submitted a written internal appeal to Anthem (the "Appeal").

45. The Appeal quoted the SPD's "Important Note on Prohibited Pharmacy Benefit Practices," invoked Ohio's statutory cap on cost-sharing, and documented that Ms. Herres could buy Everolimus without coverage for far less than Anthem's cost-share. The Appeal asked that Anthem "identify the cash price, usual and customary price, negotiated amount, pharmacy, level,

and other pricing information it used when processing the claim and explain how the resulting cost sharing complies with the Plan's policy."

46. The Appeal also asked Anthem to produce, within 30 days:

(a) All internal rules, guidelines, protocols, or other criteria relied upon in pricing decisions for coverage of Everolimus 0.5 mg for Ms. Herres's heart transplant treatment;

(b) An explanation of the scientific or clinical judgment applied in making the determination, as applied to the terms of the Plan and to Ms. Herres's medical circumstances;

(c) All clinical policies, formulary standards, tiering rules, prior authorization criteria, and exception standards specific to Everolimus and heart transplant treatment;

(d) All documents, records, and other information in Anthem's possession relevant to Ms. Herres's claim;

(e) The credentials, board certifications, and specialties of each reviewer who participated in the adverse determinations, including any health care professional Anthem consulted with respect to the claim; and

(f) All records, notes, or communications considered in making the denial and in deciding the Appeal.

47. On July 1, 2026, just five days after Ms. Herres submitted the Appeal, Anthem denied it in a letter approximately one and one-half pages long (the "Final Denial"). The Final Denial stated that Everolimus is not eligible for a tiering exception.

48. Anthem's denial did not address the substance of the appeal, since Ms. Herres did not ask Anthem for a tiering exception. She asked Anthem to apply the cost-sharing limit in its own Plan. The Final Denial did not mention that Plan provision or Ohio law; did not identify the cash price, the usual and customary price, the negotiated amount, the net reimbursement paid to the pharmacy, or any other pricing information Anthem used to process Ms. Herres's claims; and did not explain how Anthem's cost-share complied with the Plan.

49. Despite being required to do so under ERISA, Anthem did not produce any of the documents or information Ms. Herres requested, did not identify the internal rules, guidelines, or criteria it relied on, and did not identify any person who reviewed the Appeal or any health care professional it consulted. To date, Anthem has produced none of the requested materials.

50. ERISA requires every employee benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

51. Anthem violated those requirements in at least the following respects:

(a) It failed to provide Ms. Herres, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to her claim, as required by 29 C.F.R. § 2560.503-1(h)(2)(iii).

(b) It failed to take into account all comments, documents, records, and other information Ms. Herres submitted, including the Plan provision and Ohio

law on which her Appeal rested, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

(c) It failed to provide the specific reasons for the adverse determination appeal decision and the internal rules, guidelines, or criteria relied upon, in violation of 29 C.F.R. § 2560.503-1(j);

(d) It failed to identify the medical or other experts, if any, whose advice was obtained in connection with the adverse determinations, in violation of 29 C.F.R. § 2560.503-1(h)(3)(iv) and (h)(4); and

(e) It denied the Appeal on a ground Ms. Herres had not raised, without engaging the ground she had raised, so that Ms. Herres never received a review of the actual basis of her claim.

52. The Final Denial was Anthem's final internal adverse benefit determination on Ms. Herres's claim. As the Plan requires a single internal appeal, Ms. Herres has therefore exhausted the Plan's internal appeals procedure.

53. Ms. Herres is not required to seek external review before filing this action, as ERISA does not require a claimant to complete before bringing a civil action. Ms. Herres Continues to Be Harmed.

54. Because Ms. Herres needs Everolimus every day for the rest of her life, Anthem's unlawful cost-sharing is not a single overcharge but a continuing one that recurs with every refill. Each month, Ms. Herres must either pay Anthem's inflated cost-share or buy her medication outside her coverage, without that spending counting toward her Plan's deductible or out-of-pocket maximum. Either way, she pays more than the Plan permits.

55. Unless Anthem is ordered to comply with the Plan, Ms. Herres will continue to be overcharged for a drug that she cannot safely go a single day without.

## COUNT I

### Recovery of Benefits Due, Enforcement of Plan Terms, and Clarification of Rights to Future Benefits — 29 U.S.C. § 1132(a)(1)(B)

56. Plaintiff incorporates by reference all preceding paragraphs as though each were fully stated herein.

57. Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."

58. The terms of the Plan, including the SPD's "Important Note on Prohibited Pharmacy Benefit Practices" and Ohio Rev. Code §§ 3959.20 and 3957.26, entitle Plaintiff to obtain covered prescription drugs, including Everolimus, for a cost-share no greater than the amount she would pay for the drug without coverage.

59. Anthem breached the terms of the Plan by requiring Plaintiff to pay, and directing pharmacies to collect from her, cost-sharing for Everolimus that exceeded that limit, and by denying Plaintiff's appeal seeking enforcement of that limit.

60. Anthem's denial was arbitrary and capricious because it ignored the Plan term and the statute on which Plaintiff's claim rested, rested on a ground Plaintiff did not raise, was not the product of a deliberate and principled reasoning process, and was made without the full and fair review ERISA requires.

61. Plaintiff is entitled to recover the benefits due to her: the difference between the cost-share Anthem required for each Everolimus fill and the amount permitted under the Plan, in

an amount to be proven, together with appropriate credit toward her deductible and out-of-pocket maximum. She is further entitled to interest on the delayed payment of appropriate benefits.

62. Plaintiff is also entitled to enforce her rights under the Plan and to a declaration clarifying her right to future benefits: specifically, that for as long as she remains covered under the Plan, Anthem may not require a cost-share for her Everolimus greater than the lesser of the amount she would pay without coverage or the net reimbursement paid to the pharmacy.

**COUNT II**

**Injunctive and Other Appropriate Equitable Relief — 29 U.S.C. § 1132(a)(3)**

63. Plaintiff incorporates by reference all preceding paragraphs as though each were fully stated herein.

64. Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," or "to obtain other appropriate equitable relief" to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

65. Anthem's ongoing practice of requiring Plaintiff to pay, and directing pharmacies to collect, cost-sharing for Everolimus that exceeds the limit set by the Plan and by Ohio law violates the terms of the Plan. Anthem's refusal to disclose the pricing information and documents relevant to Plaintiff's claim violates 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(h)(2)(iii).

66. Because the overcharges recur with every refill of a medication Plaintiff must take daily for life, a money judgment for past overcharges cannot by itself make Plaintiff whole or stop the violations. Plaintiff has no adequate remedy at law for these continuing violations, and the injunctive relief sought here, directed at Anthem's ongoing method of calculating her cost-share and its refusal to disclose the data on which that calculation rests, is distinct from the recovery of

past benefits sought in Count I. This Count is pleaded in addition to, and in the alternative to, Count I, to the extent relief under Count I is unavailable or inadequate.

67. Plaintiff is entitled to an injunction (a) prohibiting Anthem, and any pharmacy benefit manager or other administrator acting on its behalf, from requiring Plaintiff to pay, or directing any pharmacy to collect from her, cost-sharing for Everolimus in excess of the lesser of the amount she would pay without coverage or the net reimbursement paid to the pharmacy; and (b) requiring Anthem to reprocess all of Plaintiff's Everolimus claims under that limit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and award the following relief:

A. A declaration that, under the terms of the Plan, Ms. Herres is entitled to obtain Everolimus at a retail (brick and mortar) pharmacy for a cost-share no greater than the lesser of (i) the amount she would pay for the drug if purchased without coverage under the Plan, or (ii) the net reimbursement paid to the pharmacy for the drug;

B. An award of the benefits due to Ms. Herres under the terms of the Plan in an amount to be proven, representing all cost-sharing for Everolimus that Ms. Herres paid in excess of the amount permitted under the Plan;

C. An order requiring Anthem to reprocess all of Ms. Herres's Everolimus claims in compliance with the Plan and to credit the correct cost-sharing amounts and Ms.

Herres's out-of-pocket purchases of Everolimus made outside her coverage toward her deductible and out-of-pocket maximum;

D. An order clarifying Ms. Herres's right to future benefits under the Plan consistent with Paragraph A;

E. A permanent injunction prohibiting Anthem, and any pharmacy benefit manager or other administrator acting on its behalf, from requiring Ms. Herres to pay, or directing any pharmacy to collect from her, cost-sharing for Everolimus in excess of the amount permitted under the Plan;

F. An order requiring Anthem to produce to Ms. Herres all documents, records, and other information relevant to her claim within the meaning of 29 C.F.R. § 2560.503-1(m)(8), including the pricing information used to process each of her Everolimus claims;

G. Prejudgment and post-judgment interest;

H. Reasonable attorney's fees and costs of this action under 29 U.S.C. § 1132(g)(1); and

I. Such other and further relief as the Court deems just and proper.

Dated: November 5, 2026

Respectfully submitted,

/s/ Claire W. Bushorn Danzl
Claire W. Bushorn Danzl (Ohio Bar No. 87167)
THE BUSHORN FIRM, LLC
810 Sycamore Street
Cincinnati, Ohio 45202
Phone: (513) 827-5771
Fax: (513) 216-8717
cbushorn@thebushornfirm.com
*Trial Attorney for Plaintiff (S.D. Ohio Civ. R. 83.4)*

Bryan D. Thomson (*pro hac vice* motion forthcoming) (KBA (KY) Bar No. 101890)
BRYAN D. THOMSON, ATTORNEY AT LAW, PLLC
308 W. Riverwood Drive
Hopkinsville, Kentucky 42240
(270) 632-8298
Bryan.D.Thomson.Legal@gmail.com

*Counsel for Plaintiff Payton Herres*